Filed 12/9/20  McMillan v. County of Siskiyou CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| CLIFTON H. MCMILLAN III et al., | C087960 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCCVPT1700250) |
| v. | |
| COUNTY OF SISKIYOU, | |
| Defendant and Respondent. | |

SUMMARY OF THE APPEAL

Appellants Butte Creek Minerals, Ltd. (BCM) and Clifton H. McMillan, BCM's owner, requested a hearing before the Siskiyou County Planning Commission (Commission) to determine whether they have vested rights to surface mine on a 1,741-acre property in Siskiyou County.  The Commission determined appellants have no such right.  After an unsuccessful administrative appeal before the Siskiyou County Board of Supervisors (Board), appellants challenged the determination in the superior court with a petition for writ of mandate and declaratory relief action against the County of Siskiyou (County).  The trial court denied the petition, and awarded the County $14,655.17 in costs, the bulk of which the County incurred to prepare the administrative record.

On appeal, appellants argue the County and superior court (1) did not apply the "law of the case" as established in a nonpublished opinion *McMillan v. County of*

1

*Siskiyou*, November 27, 2012, C067581 (*McMillan I*) when they applied a 1953 ordinance instead of a 1974 ordinance to determine if appellants have a vested right to mine without a permit; (2) improperly interpreted the 1953 ordinance to require permits to mine the subject property for gravel; (3) incorrectly concluded that evidence does not show appellants' predecessors diligently commenced mining the property before 1953; (4) erred in finding the right to mine the property did not vest based on post-1953 conduct; (5) erred in determining that "Williamson" contracts entered between the County and BCM's predecessor did not create a vested right to mine the property for gravel; and (6) erred in awarding record preparation costs to the County. In its response, the County argues we should not hear this appeal because it is untimely. The County also argues the doctrines of laches and estoppel bar appellants from raising their claims. We find that this appeal was timely and, because appellants' arguments lack merit, we affirm the superior court's judgment and ruling regarding costs.

FACTS AND PROCEDURAL HISTORY

A. *History of Regulation of Surface Mining in the County*

The earliest instance of efforts to regulate surface mining in the County that the parties identified is Ordinance No. 181, which the County enacted in 1946. Neither party takes the position that the 1946 ordinance applied to the property.

The next ordinance the County passed that the parties identify is Ordinance No. 256, which the County passed in 1953. According to Ordinance No. 256, "the establishment of any of the following shall not be permitted unless and until a use permit shall first have been secured in each case. ¶ . . . ¶ 2. Commercial Excavation of natural materials within 100 feet of a public road. ¶ . . . ¶ 10. Surface mining, involving heavy power equipment." Ordinance No. 256 applied to "all of the unincorporated area[s] of the County." The County passed an amendment to Ordinance No. 256 in 1957, which carved out "Logging Operations" from commercial excavations within 100 feet of a

2

public road that would not require a permit but retained all requirements with respect to "[s]urface mining involving heavy power equipment." In 1960, the County passed additional amendments to Ordinance No. 256 without substantive impact on what would trigger the permitting requirements for surface mining or commercial excavation.

The next instance of the County regulating surface mining that appears in the record is Ordinance No. 623, which the County adopted in June 1974. Ordinance No. 623 added Chapter 6, Title 10 to the Siskiyou County Code (SCC). Section 10-6.1502 of the SCC as amended by Ordinance No. 623, required a "use permit" be obtained before one could engage in the "mining of natural mineral resources together with the necessary buildings and appurtenances incident thereto."

In 1975, the California Legislature enacted the Surface Mining and Reclamation Act (SMARA) (Pub. Resources Code, § 2770 et seq.). SMARA requires that every surface mining operation have a permit, a reclamation plan, and financial assurances to implement the planned reclamation. (Pub. Resources Code, § 2770, subd. (a).) Those with a vested right to conduct surface mining prior to 1976 are exempt from the permit requirement. (Pub. Resources Code, § 2776, subd. (a).) Regardless of vested status, all operations conducted after January 1, 1976, require a reclamation plan. (*Id.*, subd. (b).)

In response to SMARA, the Board adopted chapter 5 of Title 10 of the SCC entitled "Surface Mining and Reclamation." (SCC, § 10-5.101 et seq.) "The purpose of this chapter is to implement and supplement" SMARA. (SCC, § 10-5.101, subd. (a).)

B. *Ownership and Use History of the Property Prior to McMillan's Purchase*

The property at issue is known as the Timberhitch Quarry or Timberhitch Pit and is located in the Butte Valley in eastern Siskiyou County.

Little is known about who owned the property prior to 1961, at which time, records demonstrate Ralph and Anabel Lutz owned some of the various parcels that make

3

up the property. Records identify the Lutzs as the owners of the additional parcels that complete the property by 1963.

In the vesting determination proceedings before the County, McMillan submitted an aerial photograph of the property from 1944 that he claimed showed there were areas of the property where mining occurred by the time the photograph was taken. In his written declaration, McMillan wrote, with respect to the images, he "was told by Ralph Lutz, the previous owner who [also] worked at [a local mill] as a young man, these excavations were made by horse-drawn scrapers digging and gathering alluvial gravel which was transported up the [n]orth face of Mt Hebron on the narrow gauge railroad that was part of the Jerome logging and sawmill operation in the late 1890s and early 1900s."

McMillan also indicated that sometime after World War II Lutz acquired "a military surplus RD 7 cable bulldozer. With this machine he developed the cinder pit farther south" and "constructed a ramp and delivery chute that would take the bulldozed cinders and direct them into his 4 1/2 yard international dump truck. He [then] supplied those cinders to the U.S. Forest Service when they were developing" a base for "vehicle storage and maintenance yards in the early [19]50s. He also said [that] he sold cinders for" the construction of an additional parking area, a post office, a store, and a sawmill. According to McMillan, Lutz, "acquired the property from the Forest Service for expansion of his ranch by a trade."

C. *Ownership and Use History of the Property Following McMillan's Purchase*

McMillan acquired the property in 1967. He established a corporation, Timberhitch, Inc., and transferred the property to it. When McMillan purchased the property in 1967, his "objective was to improve the productivity of the property . . . and exploit its natural resources which were potential viable crop lands, alluvial deposits and timber stands." Timberhitch mined the property for sand, gravel, and rock.

4

In 1969, the County adopted Resolution No. 404, which established agricultural preserves as contemplated by the California Land Preservation Act of 1965 (Williamson Act, Gov. Code, § 52100 et seq.), and entered into various "Williamson Contracts" with local landowners, including Timberhitch, Inc. The Williamson Act authorizes contracts between local government and local landowners to preserve agricultural land by restricting its use to agriculture or compatible uses in exchange for reduced property taxes. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 791.)

According to Resolution No. 404, the land within the established agricultural preserves was to be used "for the purpose of producing agricultural commodities for commercial purposes and compatible uses," which would include "[n]atural resource development." According to the resolution, use of property in agricultural preserves for some specific nonagricultural uses--e.g., for churches and schools --would be "[s]ubject to obtaining a use permit, where a public hearing thereon has been held." Similarly, the 1969 contract indicates that during the term of agreement, the "land shall not be used for any purpose, other than the production of agricultural commodities for commercial purposes and compatible uses as listed in the resolution establishing the preserve within which the land is located."

At the hearing before the Board, McMillan presented aerial photos which he claims show areas of the property that were mined prior to 1974. The alleged mining activities include excavation done in 1973 by the O'Hare Construction Company on a U.S. highway project, excavations prior to 1973 to supply materials used in building a road, excavations from a reservoir in the late 1960s and early 1970s, and excavation to provide materials to build a canal.

In August of 1989, the Federal Land Bank of Sacramento acquired the property. Shortly thereafter, the Theodore E. Thom DDS-MSD-PC Employee's Profit Sharing and Pension Trust (Thom Trust) partnered with Timberhitch, Inc. and reacquired the property. In 2003, McMillan formed BCM, and the Thom Trust deeded the mineral rights to the

property to BCM and retained the surface rights. In 2006, Jack and Jim Williamson acquired the surface rights to the property.

D. *Permits Secured for Mining the Property*

According to McMillan, he first sought a permit for Timberhitch, Inc. to mine the property in 1973. However, when he went to County offices to turn in the application, "[t]he clerk took it back to the director who came out and told me it was unnecessary in Ag[ricutural] Preserve property."

In 1979, the Commission issued Timberhitch, Inc. a five-year use permit to operate three gravel excavation sites. This appears to be the first use permit on record for the property. The use permit was subsequently renewed in 1984 and 1989, and another permit was approved in 1993.

E. *McMillan I*

Subsequent to the issuance of the 1979 use permit--dating as far back as 1990 and coming to a head in 2006--the County and McMillan began to dispute whether Timberhitch, Inc. and later BCM were in compliance with various requirements under SMARA and local ordinances that governed the conditions placed on entities with use permits to mine land.

In 2006, following an inspection of the property during which inspectors determined the property was not in compliance with various requirements of the local use permit and SMARA, the Siskiyou Planning Department began meeting and corresponding with McMillan In an effort to resolve the purported deficiencies. (*McMillan I* at p. *8.) Eventually, in August 2007, the Department issued an Order to Comply with various requirements of the use permit and SMARA. (*Id.* at p. *11.) Following a series of hearings before the Commission and then the Board, the Order to Comply was confirmed. (*Id.* at pp. *13 & *15.) Throughout the hearings before the Commission and the Board, McMillan maintained that "the information he had provided,

6

including the Williamson Act contracts covering the land, established that he had a vested right to mine. He claimed that with a vested right that arose before 1976, he did not need a use permit." (*Id.* at p. *11.) He further maintained that his right to mine covered the entire property, not just the patches previously mined because " 'you go where the gravel is.' " (*Id.* at p. *12.)

Appellants then sought a writ of mandate in the superior court in which they challenged the Order to Comply and alleged the County had failed to proceed in a manner required by law. (*McMillan I* at p. *15.) The superior court denied the petition and request for declaratory relief. (*Id.* at p. *17.) On appeal, this court reversed the superior court determination and remanded the case for a vesting determination. (*Id.* at p. *3.)

At issue in *McMillan I* was whether a writ of mandate ought to have been issued directing the County to (1) vacate the Order to Comply, and (2) make a vesting determination as to whether appellants possessed a vested right to mine the land. (*Id.* at pp. *1-*3.) The appellants maintained that "they have a vested right to mine that, under the diminishing asset doctrine, extends to the entire property, not just the portion previously mined." (*McMillan I* at p. *1.) This court held:

"[T]hat plaintiffs are entitled to a vesting determination and such determination may properly be based on actions of plaintiffs' predecessors in mining the Timberhitch Quarry. A determination of whether plaintiffs have a vested right to continue to mine Timberhitch Quarry, and, if so, the extent of that right, is a necessary prerequisite to enforcement actions because the vested determination governs the coverage of the reclamation plan and the financial assurances." (*McMillan I* at p. *3.) Additionally, we directed the superior court to:

"[I]ssue a writ of mandate ordering the County to rescind its Order to Comply, to vacate existing notices of violations and penalties with respect to Timberhitch Quarry, and to conduct a vesting determination in compliance with *Hansen Brothers*

7

*[Engineering Co. v. South Central Coast Regional Com.* (1986)] 12 Cal.4th 533[ (*Hansen*)] and *Calvert [v. County of Yuba* (2006)] 145 Cal.App.4th 613[ (*Calvert*)], as to plaintiffs' claim of a vested right to continue mining Timberhitch Quarry. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(b).)" (*Id.* at p. *45.)

F. *Proceedings Following Remand*

McMillan requested a vested mining rights determination from the County in October 2015. The Commission held a hearing on August 10, 2016. In September 2016, the Commission found appellants "have no vested right to surface mine the subject property" and had "failed to meet their burden of proof."

Appellants filed an appeal of the Commission's decision with the Board. In considering appellants' claim to a vested right to mine the property, the Board found that the property was located in an area of the County that was subject to the 1953 ordinance, Ordinance No. 256. Thus, the Board indicated that "any surface mining on the property became non-conforming use on May 15, 1953, which is therefore the date that rights would have vested on the subject property if properly established by the appealing party," and that, "[i]n order to determine that [a]ppellants have vested rights the Board must find that lawful surface mining was diligently commenced prior to May 14, 1953." Relying on this requirement, the Board considered the evidence presented by appellants regarding whether surface mining operations at the property as contemplated by Ordinance No. 256 had " 'diligently commenced,' or commenced at all" by 1953. In so doing, the Board indicated it was unable to make a determination regarding what type of land-use activity was depicted in the 1944 aerial photos McMillan provided. The Board concluded (1) that appellants did not meet their burden of proving, by the preponderance of the evidence, that they had a vested right to mine the property; and, therefore, (2) "that the [a]ppellants do not have a vested right to surface mine on the subject property."

This action followed.

8

I

*This Appeal Is Timely*

The County argues this appeal is untimely. It is not.

According to California Rules of Court, rule 8.104(a)(1), a party must file a notice of appeal on the earliest of the following dates: "(A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, showing the date either was served; ¶ (B) 60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, accompanied by proof of service; or ¶ (C) 180 days after entry of judgment."

Here, the judgment was entered on July 18, 2018, and the County served a notice of entry of judgment on August 3, 2018. Sixty days after August 3, 2018, was Tuesday, October 2, 2018. Petitioner filed the notice of appeal on September 10, 2018, well before October 2, 2018.

The County's argument that the appeal was untimely is based on the County's position that the appealable order at issue was not the July 18, 2018, judgment but the April 2, 2018, statement of decision made by the superior court which served as the basis for an April 11, 2018, motion for reconsideration filed by appellants. Treating the statement of decision as the operative appealable order, the County reasons that the applicable rule for determining the deadline to file a notice of appeal is an exception to California Rules of Court, rule 8.104 contained in rule 8.108(e), which is triggered when a party serves a motion to reconsider an appealable order. Under rule 8.108(e), if the statement of decision was the operative appealable order, the last day to file an appeal would have been July 10, 2018. (See Cal. Rules of Court, rule 8.108(e).) "But a

9

statement of decision is not treated as appealable when a formal order or judgment does follow, as in this case." (*Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 901.) To do so would "contravene 'the well-established policy, based upon the remedial character of the right of appeal, of according that right in doubtful cases "when such can be accomplished without doing violence to applicable rules." ' [Citations.]" (*Ibid.*) This is true even if the appellant and the trial court treated the statement of decision like a final order in a motion to challenge that decision. (See *In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1571-1572 ["Although the trial court apparently treated its statement of decision as a judgment when it entertained [the] motion for a new trial, its error in doing so does not affect our jurisdiction to hear [the] appeal under the particular facts and circumstances presented here"].) Here, the trial court indicated in the text of the statement of decision that it was a "*proposed* Statement of Decision pursuant to California Rule of Court 3.1590," and the concluding paragraphs indicated that a "judgment *shall be entered* in favor of the County." This language indicates the superior court anticipated a formal judgment would follow. Moreover a formal judgment did follow. The deadline to file a notice of appeal was October 2, 2018, and appellants met that deadline.

II

*The County Correctly Determined There Is No Vested Right to Surface Mine the Property*

SMARA generally requires entities conducting surface mining to secure permits. (Pub. Resources Code, § 2770, subd. (a).) There is an exception to the SMARA's permitting requirement if a person "has obtained a vested right to conduct surface mining operations prior to January 1, 1976, . . . as long as the vested right continues and as long as no substantial changes are made in the operation except in accordance with this chapter. A person shall be deemed to have vested rights if, prior to January 1, 1976, the person has, in good faith and in reliance upon a permit or other authorization, if the

10

permit or other authorization was required, diligently commenced surface mining operations and incurred substantial liabilities for work and materials necessary for the surface mining operations." (*Id.*, § 2776, subd. (a).)

Based on this exception to SMARA's requirements and the issues raised in this action, we will undertake a four step analysis to determine if appellants have a vested right to mine the property for gravel without a permit. First, we identify the earliest point when the County or state enacted ordinances or statutes governing the permitting of mines where the property is located. Second, we determine whether that ordinance or statute applies to the form of gravel extraction appellants wish to perform without a permit at the property. Third, we determine if appellants met their burden to demonstrate that the covered form of gravel extraction had diligently commenced at the property by the time the applicable ordinance or statute was adopted. Finally, we consider whether other factors might excuse the property from SMARA's permitting requirements.

A. *Standard of Review*

A party that claims the right to engage in a nonconforming use of property based on prior use at the time a zoning ordinance was adopted bears the burden of proof "to establish *the lawful* and continuing existence of the use at the time of the enactment of the ordinance." (*Melton v. San Pablo* (1967) 252 Cal.App.2d 794, 804; see also SCC, § 10-5.106(g)(1).)

Because the County's determination that there was not a vested right to mine the land "effectively precludes continuance of" appellants' ability to conduct a mining business on the property, "unless it applies for and is granted a conditional use permit by the county, the superior court properly exercised its independent judgment in making factual determinations based on the administrative record." (*Hansen, supra,* 12 Cal.4th at p. 559.) We must uphold the superior court's findings of fact if those facts are supported by substantial evidence. (*Ibid.*) In instances where the facts are undisputed and what

11

remains is a question of law, we apply independent or de novo review.  (*Id.* at p. 560; see also *People v. Cormer* (2001) 24 Cal.4th 889, 894.)  However, even when applying an independent judgment test, courts must give a strong presumption of correctness to the administrative findings, and the "burden rests upon the complaining party to show that the administrative decision is contrary to the weight of the evidence."  (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816-817, internal quotation marks removed.)

We interpret contract terms using de novo review.  (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.)  We interpret Williamson Act contracts "according to the usual rules for construing contracts in general."  (75 Ops. Cal. Atty. Gen. 278, 281, citing *Delucchi v. County of Santa Cruz* (1986)179 Cal.App.3d 814, 821-822 and *County of Marin v. Assessment Appeals Board* (1976) 64 Cal.App.3d 319, 324-325.)

B.  *The Law of the Case Does Not Preclude Application of the 1953 Ordinance*

Appellants argue that, for purposes of this matter, we must treat 1974 as the first year in which a permit was required by the County under the doctrine of the law of the case.  They maintain this is so because in *McMillan I* this court "expressly rejected the County's argument" that an earlier ordinance required a permit for mining and found that "the County was bound by the position it took in the administrative proceedings," which was that "no use permit was required before 1974."  We disagree.  Appellants' argument mischaracterizes both the plain text and the import of this court's decision in *McMillan I*.

Given the significance appellants place on references to the 1974 ordinance in *McMillan I*, it is helpful to review the four times this court references that ordinance in *McMillan I*:

o   First, in our recitation of background facts describing the history of mining regulation in Siskiyou County, we stated, "[i]n the mid-1970's, the government began regulating surface mining.  In 1974, the Siskiyou County

Board of Supervisors adopted an ordinance that required a use permit for mining." (*McMillan I* at pp. *4-*5.) This court noted in a footnote to this sentence, which appellants heavily rely on in making their argument, that, "[i]n its answer to the petition, the County asserts that a use permit was required for surface mining since 1958. It argues that since no use permit was obtained until 1979, mining at Timberhitch Quarry was not legal and therefore no vested rights arose. At the hearing before the Board of Supervisors, however, the County stated no use permit was required before 1974." (*Id.* at p. *5, fn. 4.)

o Second, in describing the factual context in which the Order to Comply was issued, this court observed that in addressing the applicability of Williamson contracts to permit requirements in a report provided to the Commission, staff indicated, "even though mining, or natural resource development, was permitted in agricultural areas of the County under the Williamson Act, a use permit was still required to mine. A use permit was not required only for mines in production prior to 1974, as those mines were vested. In the case of Timberhitch Quarry, however, because the boundaries of the mining had expanded, a use permit was required." (*McMillan I* at pp. *11-*12.)

o Third, in its discussion regarding whether the County must make a vesting determination, this court described appellants' position as being that "they have a vested right to mine the entire property of Timberhitch Quarry without a use permit because the property was mined before 1976, the date of SMARA's implementation." (*McMillan I* at p. *24.) In a footnote, this court noted that certain amici contended that "a common law vested right to mine Timberhitch Quarry arose in 1974 when the County passed an ordinance requiring a permit to mine. Amici contend SMARA merely

13

recognized this vested right in 1976. As the question of whether the vested right arose in 1974 or 1976 is not relevant to our analysis, we need not answer it." (*Id.* at p. *25, fn. 12.)

- o Finally, this court made reference to the 1974 ordinance in describing the appellants' argument regarding the applicability of the diminishing asset doctrine: "Here, plaintiffs contend they have a vested right to mine the entire Timberhitch Quarry, even portions that were not mined before 1976, based on the diminishing asset doctrine. Before the requirement of a use permit went into effect (in 1974 under the SCC and in 1976 under SMARA), in reliance on the authorization provided by the Williamson Act contracts, under which mining was permitted, surface mining was conducted at Timberhitch Quarry. Plaintiffs contend the intent was to mine the entire property as 'you go where the gravel is.' " (*McMillan I* at p. *32.)

The doctrine of the law of the case, which applies to prevent a contrary ruling on a point of law previously ruled upon by a reviewing court, is invoked only "where the point of law involved was necessary to the prior decision and was ' "actually presented and determined by the court." ' " (*People v. Gray* (2005) 37 Cal.4th 168, 197.) In *McMillan I*, the key holdings and directives were that (1) appellants were entitled to a vesting determination (*McMillan I* at p. *45); (2) the vesting determination would need to be made in a proceeding by noticed hearing per the directives of *Calvert* (*id.* at pp. *42-*43); and (3) in making that vesting determination the County would need to apply rules outlined in *Hansen*, which applies the diminishing asset doctrine in identifying the area of a property subject to a vesting determination and which allows vesting determinations to be based on the use of land by prior owners (*id.* at pp. *39-*40). To make these holdings, it was not necessary for this court to opine as to whether the County began requiring the use of permits to mine land in 1974 or sometime in the 1950s. Instead, this court, in describing the regulatory history that gave rise to the issues in *McMillan I*, used 1974 as a

14

reference point in the general background, and dropped one footnote to explain why it chose the convenience of using 1974 as a starting point and another indicating the specific year a vested right could have arisen was "not relevant to our analysis" as to whether a vesting determination was needed. (*Id.* at pp. *24-*25, fn. 12.) Moreover, at least three of the four points referenced above describe not the court's holdings, but the factual background, as argued by the parties regarding the year 1974.

Appellants argue that the holding that no permit was required prior to 1974 was a principle or rule of law necessary to the *McMillan I* decision because "[i]f a permit had been required prior to 1974, there would have been no need for this Court to order a vesting determination; it was at all relevant times undisputed that Appellants had no such permit." This position is contrary to the import of this court's reasoning in both *McMillan I* and *Calvert*.

In *McMillan I*, this court observed that the many factors to be considered when determining whether a vested right exists would "require[] a hearing to resolve numerous factual issues." (*McMillan I* at p. *40.) Which ordinances applied and when they applied are two of these numerous issues.

In *Calvert*, the court emphasizes that a noticed public hearing is essential to protect the interests of both the party that seeks to mine property and adjacent landowners whose own property interests might be impacted by a vesting determination. (See *Calvert*, *supra*, 145 Cal.App.4th at pp. 626-62f7.) In *Calvert* the County of Yuba had sent Western Aggregates LLC (Western) a determination letter that stated, based on a written application package, Yuba County had determined Western had a vested right to mine 3,430 acres of property. (*Id.* at p. 618.) Yuba County made the determination "without notice to adjacent landowners or to the public, and without a hearing." (*Ibid.*) A local rancher who owned property near the parcel at issue and a local coalition brought an action challenging Yuba County's determination. (*Id.* at pp. 618-619.) It is in this context that this court ruled "[i]f Western wants to continue its aggregate mining [of the

property] it will either have to prove its claim of vested rights in a public adjudicatory hearing before the Board (to be conducted within the County's area of jurisdiction), or obtain a permit to conduct such surface mining based on a public adjudicatory hearing before the County." (*Id.* at pp. 635-636.)  A public hearing was needed because "property owners adjacent to the proposed mining have significant property interests at stake," and the potential "property deprivation" to those owners if Western had been given rights to mine the land were " 'substantial' enough to require procedural due process protection." (*Id.* at pp. 626-627.)

In short, *Calvert* hearings do not just protect the party who wants to mine land; they protect local landowners who might want the land to remain unmined or to at least remain subject to permitting requirements.  In this context, if we were to accept appellants' argument that the County was barred from considering earlier ordinances in the hearing on remand, we would deprive other County residents of the ability to participate in a full and complete consideration of the issues including an investigation of which past ordinances might have applied to permitting at the property.  Moreover, we would be limiting that proceeding based on statements and conclusions made at a prior hearing that was found to be inadequate.

The County was allowed to consider the 1953 ordinance in the vesting hearing on remand.

## C. *Application of the 1953 Ordinance*

Because the law of the case did not require the County and superior court to treat 1974 as the cutoff date for the vesting of gravel mining rights at the property, we now consider whether the right to mine the property for gravel needed to vest by 1953.

This assessment is twofold.  First, we consider if Ordinance No. 256 applied to the form of gravel extraction at issue here, thereby triggering a requirement that any such activity after 1953 be either permitted or done pursuant to a vested right.  Second, if we

16

determine Ordinance No. 256 applied to these activities, we must determine if the right to engage in those activities vested before Ordinance No. 256 passed, thereby obviating the requirement to secure a permit to mine gravel after the ordinance passed. We conclude that (1) Ordinance No. 256 did require a permit for the type of mining at issue here, and (2) the County and superior court properly concluded appellants did not meet their burden to establish the right to mine the property for gravel vested before 1953.

Before explaining our conclusions, we note we focus our discussion on the meaning of the term "surface mining" in Ordinance No. 256. We asked the parties to submit supplemental briefing regarding the meaning of the phrase "heavy power equipment." In their supplemental brief, appellants argue that the term "heavy power equipment" can only be understood as used in conjunction with "surface mining," and then use the portion of their supplemental brief allotted to respond to our inquiry regarding the meaning of "heavy power equipment" to expand on their argument that the gravel extraction at issue here was not surface mining. In a later section of their supplemental brief regarding evidence of the use of heavy power equipment in the administrative record, appellants (1) note the earliest record of "engine-powered equipment" purchased was of a bulldozer bought by Lutz "in the late 1940s" and (2) suggest that "heavy power equipment for the commercial excavation of natural materials involved . . . horse-drawn dragged scrapers that were used to gather gravel to support construction of a narrow-gauge railroad" in the late 1800s or early 1900s As it does not change our conclusion that the evidence in the record did not support a finding that the right to mine the property was vested by 1953, we treat "horse drawn scrapers" and bulldozers as heavy power equipment for the sake of our analysis.

*1. The 1953 Ordinance Required a Permit for the Gravel Extraction at Issue Here*

Ordinance No. 256 prohibited both the "[c]ommercial excavation of natural minerals within 100 feet of a public road," and "[s]urface mining, involving heavy power

17

equipment" on unincorporated lands within Siskiyou County "unless and until a use permit [was] secured." Neither party has taken the position that the mining at issue here has occurred within 100 feet of a public road. Thus, we are left to consider if the mining for sand, gravel, and rock at issue here is "surface mining, involving heavy power equipment" according to the terms of the ordinance. Appellants argue that the terms of the ordinance and the historical record demonstrate "surface mining" as used in Ordinance No. 256 does not apply to the type of gravel extraction at issue here. We disagree.

We interpret ordinances using the same rules we use to interpret statutes. (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1183.) "These rules are well established. 'When faced with a question of statutory interpretation, we look first to the language of the statute. [Citation.] In interpreting that language, we strive to give effect and significance to every word and phrase. [Citation.]' (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1284–1285 [ ].) These words 'are to be given their plain and commonsense meaning. [Citation.]' (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [ ].)" (*Amaral v. Cintas Corp. No. 2* at pp. 1183-1184.) "Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation." (*Murphy v. Kenneth Cole Productions, Inc.* at p. 1103.) At first blush, it appears a permitting requirement for "surface mining" plainly captures the extraction activities at issue here. Nevertheless, we briefly address appellants' arguments that rules of statutory construction and historical context dictate otherwise.

First, appellants argue that in requiring a permit for the commercial excavation of natural minerals within 100 feet of a road, Ordinance No. 256 "necessarily" meant that "any gravel pits more than 100 feet from a road did not require a use permit." Relying on this position, appellants then conclude the "obvious and inescapable conclusion is that the authors of the 1953 [ordinance] regarded 'commercial excavation of natural materials' as

18

something different than 'surface mining.' " To reach appellants' conclusion one must assume that in requiring a permit for the commercial excavation of natural materials within 100 feet of a public road, the County intended to grant unfettered permission to engage in that type of gravel extraction if it occurred more than 100 feet from a public road, regardless of the extent to which and speed with which that extraction would result in tearing up the ground. But that conclusion is not dictated by the plain language of the ordinance. A more straightforward--and plausible--reading of the plain language of the ordinance is that the County intended to require permits for *both* the commercial excavation of natural resources within 100 feet of a public road, regardless of the type of equipment used in that excavation, *and* surface mining of County lands using heavy power equipment, regardless of how far away that mining occurred from public roads. Put differently, requiring a permit for the commercial excavation of natural minerals within 100 feet of a road, does not mean that "*any* gravel pits more than 100 feet away from a road did not require a use permit"; it means that *some* gravel extraction activities more than 100 feet from a road did not require a use permit. Thus, taken together the plain meaning of the two parts of the ordinance do not create a conflict if the extraction of gravel at issue here is considered both a form of commercial excavation of natural materials more than 100 feet from a public road *and* a form of surface mining involving heavy power equipment.

Next, appellants argue that the gravel extraction at issue here would not have been considered "surface mining, involving heavy power equipment" in 1953 by suggesting that at the time Ordinance No. 256 was passed, the County understood "surface mining" to mean something more akin to "placer mining," and "placer mining" specifically involves mining sand, gravel, or rock to separate out precious metals contained therein. To make this argument, appellants turn to the 1946 ordinance, Ordinance No. 181, which specifically stated that "for the purpose of *this* ordinance certain terms herein are herewith defined . . . . [¶] . . . [¶] 'Surface mining' is defined as placer mining carried on

19

through the use of conventional excavating machinery, such as dredgers, truck scrapers, power shovels, draglines, tractors, trucks, and bulldozers, and also by the use of hydraulic monitors." Appellants try to buttress this argument in their supplemental brief by citing Oregon, New Mexico, and Utah cases from around the time the County passed Ordinance No. 256 to suggest gravel and sand were not considered "minerals" in 1953, and mining was understood to be an activity to extract minerals. Therefore, based on appellants' line of reasoning, surface mining was not understood to include operations to extract gravel and sand from land.

As to appellants' reliance on Ordinance No. 181, the ordinance specifically limited its narrow definition of "surface mining" to that ordinance. Presumably, if the County had wanted to apply similar limits to Ordinance No. 256's use of the term "surface mining," it would have explicitly done so.

As to what can be gleaned from contemporaneous caselaw, a search for California decisions between the dates January 1, 1948, and December 31, 1958, that contain the words "gravel" and "mine" reveals that gravel extraction of the sort at issue here was considered mining. In *Williams v. Pacific Coast Aggregates, Inc.* (1954) 128 Cal.App.2d 777, 778 a plaintiff ranch owner brought negligence and nuisance claims against a defendant "mine operator" alleging the defendant's "sand and gravel mining operations" had damaged his crops. The defendant in that action created "gravel pits" as part of his mining operations. (*Id.* at p. 780.) In *Wheeler v. Gregg* (1949) 90 Cal.App.2d 348, 366 (italics added) the court described a plant that engages in the "*excavation* of rock, sand and gravel," as supplying "approximately 30 per cent of all of the rock and gravel *mined* from the . . . area." In *McCaslin v. Monterey Park* (1958) 163 Cal.App.2d 339, 344-345, 347, 348 an ordinance "entitled: 'An Ordinance of the City Council of the City of Monterey Park Amending Certain Sections of the Monterey Park Municipal Code Relating to the Excavation and Processing of Decomposed Granite, Sand, Rock and Gravel[,]' " was found not to apply to appellant's "mining [of] decomposed granite"

20

because "when a sand and gravel pit has been in operation prior to the passage of a zoning ordinance and continuously thereafter, a nonconforming use existed and operation of the pit cannot be enjoined."

Because the plain language of the ordinance applies to the type of gravel extraction at issue here, and appellants have failed to convince us otherwise, we need not engage in an assessment of the "[h]istory of County [r]egulation" of the mines to determine the meaning of the term "surface mining." Even if we were to engage in that analysis, it seems unlikely it would compel a different conclusion. For example, appellants refer to a 1973 incident in which McMillan was allegedly told by a County employee that he did not need to secure a permit "for the excavation [of] gravel." Yet a review of the note McMillan sent to O'Hare Construction--a company that in 1973 intended to build a plant on the property and use its gravel--indicates that the County employee said a permit would not be needed because the property was an "Ag Preserve property." This response would have not been dependent on the definition of surface mining, but on an--as we shall see below, erroneous--interpretation of laws applying to Williamson contracts. Interestingly, in the note to O'Hare Construction, McMillan refers to the permit O'Hare was granted to locate a plant on the property as being a permit to, "by implied consent, mine gravel." This indicates that by at least 1973, gravel was considered a substance that could be mined, and that gravel mining was viewed as subject to use permitting requirements.

*2. The County and Superior Court Correctly Determined Appellants' Predecessors Did Not Diligently Commence Mining Before 1953*

Appellants did not meet their burden to prove the property was used for surface mining for gravel by 1953. Leaving aside the strength and admissibility of the evidence provided, and considering it even in the light most favorable to the appellants, the evidence only supports a possibility that, with respect to conduct prior to 1953, at some

21

point in the late 1890s and early 1900s, gravel was extracted using horse-drawn scrapers at the property. The next point in time for which there is any indication that the property was mined for gravel comes from McMillan's statement that Lutz informed him he used a bulldozer to develop a pit and provide cinders the U.S. Forest Service "in the early 50s." Other than that, McMillan's evidence regarding Lutz's use of the property suggests that sometime before or in 1961, Lutz acquired the property with the intention to use the property "for expansion of his ranch." Taken together, at best, this evidence compels the conclusion that gravel was collected from the property in the early 1900s, and then that collection was abandoned until Lutz engaged in another short-term collection of gravel at a time that may have been after the County adopted Ordinance No. 256. Additionally, after 1953, and for over five years before McMillan bought the property, the property's owner intended to use the property for ranching.

Appellants have not met their burden to establish the right to mine the property for gravel vested before 1953.

### 3. Post-1953 Evidence Does Not Strengthen Appellants' Argument

Because we have determined that the operative year for determining whether the property vested was 1953, the evidence regarding post-1953 mining activities in the administrative record is irrelevant to consideration of whether the right to mine the property vested before the County adopted laws requiring a permit to mine the property.

Appellants imply the County should be estopped from determining the right to mine the property needed to be vested by 1953 due to McMillan's hearsay representation that in 1973 a County employee told him he did not need a permit to mine the property. Even if McMillan's representation of what transpired in 1973 is accurate, it is "well-established . . . that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public, . . . .' (*County of San Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 829-830

22

[ ], see also cases there cited.)" (*Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493.) In adopting SMARA, the Legislature declared, "that the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society, and that the reclamation of mined lands is necessary to prevent or minimize adverse effects on the environment and to protect the public health and safety," and "the state's mineral resources are vital, finite, and important natural resources and the responsible protection and development of these mineral resources is vital to a sustainable California." (Pub. Resources Code, § 2711, subds. (a) & (f).) Because SMARA was enacted to protect strong public interests, we will not use estoppel theories to justify dispensing with its requirements here.

Similarly, we are not convinced that appellants' due process rights have been violated by the County's failure to act earlier to consider whether the right to mine the property for gravel was vested. Notably, appellants argue that due process dictates we shift the burden of proof to the County to demonstrate the right to mine the property was not vested in 1953 because, as a result of the time passed between 1953 and when the County made its vesting determination, there has been decades of staff turnover in the County and witnesses like Lutz have died, rendering possible evidence unavailable. But this position ignores that the County's delay in demanding the property's owners secure a permit was due, at least in part, to McMillan and the prior owner's actions in 1979 in securing a permit.

Indeed--though because we otherwise find in the County's favor, we do not consider its estoppel and laches argument at length here--it is worth noting that the passage of time also resulted in the County losing access to witnesses and other evidence it might have otherwise had available to it had McMillan and the predecessor owner indicated earlier that they believed they had a vested right to mine the property rather than securing a permit to mine the property in 1979. " 'It is well settled, however, that courts of equity will often refuse relief if there has been such delay and passive neglect

23

on the part of the complainant as, coupled with facts amounting to acquiescence in the acts complained of, will render the granting of the relief inequitable. (*Stevenson v. Boyd*[ (1908)], 153 Cal. 630, 636 [96 P. 284, 19 L.R.A. N.S. 525].) In determining whether or not the delay has been unreasonable, regard will be had to any circumstances which justify the delay, to the nature of the case and the relief demanded, and to the question whether the rights of the defendants, or of other persons, have been prejudiced by the delay.' (See also *Cahill v. Superior Court*[ (1904)] 145 Cal. [42,] 46-47, to the same effect.)" (*Lewis v. Superior Court of Los Angeles County* (1968) 261 Cal.App.2d 736, 740-741.) As such, "[t]here seems to be no doubt that 'in a mandamus proceeding relief may be denied upon the ground of laches.' " (*Id.* at p. 740, citation removed; see also *County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 510-511 ["a landowner or his successor in title is barred from challenging a condition imposed upon the granting of a special permit if he has acquiesced therein by either specifically agreeing to the condition or failing to challenge its validity, and accepted the benefits afforded by the permit"].) At a minimum, to the extent appellants were harmed by the County's delay in holding a vesting hearing, appellants were not innocent in the creation of the delay and the County also lost evidentiary resources due to the passage of time.

    *4. The Williamson Contracts Do Not Establish a Vested Right to Surface Mine the Property*

    Appellants argue they may surface mine the property without a permit under Williamson contracts Timberhitch, Inc. and the County entered. Appellants' argument is essentially that in establishing an agricultural preserve that included the property, the County created a new district in which certain zoning requirements were superseded, including the requirement to secure a use permit before surface mining the property. We disagree. For the reasons that follow, the creation of an agricultural preserve did not result in the creation of a new zoning district and did not expand the uses owners can

24

make of the properties within the preserves. Moreover, the record does not suggest that the County intended to expand the number of uses to which owners could put their property without the benefit of a use permit.

The Williamson Act was enacted to prevent the loss of "agricultural and open space land and discourage premature urban development." (*City of Humboldt v. McKee* (2008) 165 Cal.App.4th 1476, 1487 (*McKee*).) Under the provisions of the act, the local government establishes and regulates local agricultural preserves then enters into land conservation contracts with landowners of property within those preserves. (*Id.* at p. 1482.) The contracts "may . . . limit the use of agricultural land" and "may provide for restrictions, terms, and conditions . . . more restrictive than or in addition to those required" by the act. (Gov. Code, § 51240.) "In return for accepting restrictions on the land, the landowner is 'guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its development potential.' [Citation.] The hallmark of this statutory scheme is its reliance on voluntary agreements between the government and the landowner, where the landowner chooses, on an annual basis, to accept certain limits on his or her use of the land in return for an explicit property tax reduction." (*McKee*, *supra*, 165 Cal.App.4th at p. 1482.) Williamson contracts must have an initial term of at least 10 years and "shall provide that on the anniversary date of the contract or such other annual date as specified by the contract a year shall be added automatically to the initial term unless notice of nonrenewal is given." (Gov. Code, § 51244, subd. (a).)

Significantly, "[a] county's agricultural preserve guidelines are separate from, and may be more restrictive than, its zoning regulations." (*McKee*, *supra*, 165 Cal.App.4th at p. 1493.) In short, the Williamson Act exists to *limit* land use beyond what might otherwise be permitted by law, including zoning ordinances. No language is included within these limitations that allows for *expanding* on existing zoning limitations. The

25

absence of language allowing Williamson contracts to expand the scope of how land is used within an agricultural preserve is significant.

Chapter 4, of division 1, of title 7 of the Government Code "provide[s] for the adoption and administration of zoning laws, ordinances, rules and regulations by counties."  (§ 65800.)  It allows the "legislative body of any county" to "adopt ordinances" that that regulate the use of land within their jurisdiction.  (*Id.*, § 65850, subd. (a).)  Once a county adopts zoning laws, "[a]ll such regulations shall be uniform for each . . . use of land throughout each zone."  (*Id.*, § 65852.)  Any amendment to an ordinance which removes or modifies a regulation imposed within a zone, must be adopted following specific statutory guidelines.  (*Id.*, § 65853)  As such, the *" '[r]ezoning of use districts or changes of uses and restrictions within a district can be accomplished only through an amendment of a zoning ordinance, and the amendment must be made in the same mode as its original enactment.  [Citations.]'* (Italics added.) (*Johnston v. City of Claremont* (1958) 49 Cal.2d 826, 834-835 [ ]; *Richter v. Board of Supervisors* (1968) 259 Cal.App.2d 99, 105 [ ]; 8A McQuillin, Municipal Corporations (1965 rev. vol.) § 25.245, pp. 164-165.)"  (*City of Sausalito v. County of Marin* (1970) 12 Cal.App.3d 550, 563-564; but see *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 596 fn. 14 [Disapproving *Johnston v. City of Claremont* (1958) 49 Cal.2d 826 to the extent it found that general law cities cannot adopt zoning ordinances by initiative].)

These statutory protections for maintaining uniformity within zoning districts are critical, because a " 'zoning scheme, after all, is similar in some respects to a contract; each party foregoes rights to use its land as it wishes in return for the assurance that the use of neighboring property will be similarly restricted, the rationale being that such mutual restriction can enhance total community welfare.  [Citations.]  If the interest of these parties . . . is not sufficiently protected, the consequence will be subversion of the critical reciprocity upon which zoning regulation rests.'  *(Topanga Assn. for a Scenic*

26

*Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 517–518 [ ].)" (*Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1009.) "Property owners seeking relief from a zoning restriction typically take one of three courses of action." (*Id.* at p. 1006.) Owners can either (1) obtain a change in the zoning ordinance following specific procedures (*ibid.*), (2) apply for a conditional use permit (*ibid.*); or (3) apply for a variance (*id.* at p. 1007). Neither the appellants nor their predecessors took any of these three actions. Allowing the County to create an exception to its zoning requirements that is "not a rezoning or other amendment of the ordinance, not a conditional use permit in conformance with the ordinance, and not a proper variance" would functionally allow this zoning " 'contract' " the County has with all its residents to be broken. (*Id.* at p. 1009.)

Nothing in the resolution establishing the Williamson contracts at issue here or the contract itself contravenes our conclusion that the contracts do not support appellants' position that they ought to be able to surface mine the property without a permit. While the contract and referenced resolution may identify the range of uses to which the land can be used as those that are part of "the production of agricultural commodities for commercial purposes," "compatible uses," and "natural resource development," in indicating that the "land shall not be used for any purpose, other than" the articulated range of uses, the contract establishes itself as a limit and not an extension on what landowners might be able to do with the land. "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." (Civ. Code, § 1648.) Here, though the language of "natural resource development" may be broad, the overall language suggests the parties to the contract only intended to protect the land from being converted to nonagricultural uses. This limit to natural resource development is not the same as allowing all forms of natural resource development, including unpermitted uses when a permit might otherwise be required.

27

Contrary to appellants' suggestion, the fact that surface mining was not included on the list of activities the contract specifically indicated an owner could engage in if a permit was obtained--e.g., churches, schools--does not mean any uses not on the list that constitute natural resource development could be performed without a permit. Rather, this list appears to provide a list of nonagricultural exceptions to the contract's limiting land use to natural resource development. Essentially, this language allows for a limited range of permitted nonagricultural activities that otherwise would not be allowed at all by a contract that limits the land's use to the development of natural resources. The absence of a specific type of natural-resource-development activity from that list does not remove that activity from local permitting requirements.

III

*The Superior Court Properly Denied Appellants' Motion to Strike Costs*

Appellants argue the superior court erred in denying its request to strike costs for time charged by the County's outside counsel and his paralegals to prepare the record, totaling $11,288. Appellants argue the award was both (1) in contravention of the terms of Code of Civil Procedure, section 1094.6, subdivision (c), which allows agencies to collect the costs they incur to prepare records in writ hearings, and (2) neither reasonable nor reasonably necessary as contemplated by Code of Civil Procedure, section 1033.5, which identifies costs prevailing parties may collect in litigation.

Appellants first argument concerns the meaning of Code of Civil Procedure section 1094.6, subdivision (c), which states, in a mandamus proceeding, "[t]he complete record of the proceedings shall be prepared by the local agency or its commission, board, officer, or agent which made the decision . . . . The local agency may recover from the petitioner its actual costs for transcribing or otherwise preparing the record." Appellants argue this statute can only be read to allow the County to recover the costs for work performed by agency staff, and not to allow costs for outside counsel and his paralegal.

28

We review this claim applying a de novo standard of review (*City of Long Beach v. Stevedoring Services of America* (2007) 157 Cal.App.4th 672, 678), and find appellants are incorrect. In *The Otay Ranch, L.P. v. County of San Diego* (2014) 230 Cal.App.4th 60, 70-71, the court was faced with the same question and indicated it did not "see a reason to differentiate between labor costs incurred by individuals directly employed by a public agency and those incurred by individuals employed by a private law firm retained by the agency, so long as the trial court determines, as it did here, the labor costs were reasonably and necessarily incurred for preparation of the administrative record. To hold otherwise would undermine the statutory policy of shifting the costs and expenses of preparing an administrative record away from the public and to the private individual or entity bringing the lawsuit." (*Ibid*.)

Turning to appellants' second argument, Code of Civil Procedure section 1033.5, subdivision (c)(2) and (3), requires that costs collected by prevailing parties to litigation be both "reasonably necessary" and "reasonable in amount." " 'Whether a particular cost to prepare an administrative record was necessary and reasonable is an issue for the sound discretion of the trial court. [Citations.] Discretion is abused only when, in its exercise, the court "exceeds the bounds of reason, all of the circumstances being considered." [Citation.] The appellant has the burden of establishing an abuse of discretion.' [Citation.]" (*The Otay Ranch, L.P. v. County of San Diego, supra,* at p. 68.) The $11,288 at issue here is comprised of fees charged for 42.4 hours of paralegal work at a rate of $170 per hour ($7,208) and 13.6 hours of attorney work at a rate of $300 per hour ($4,080). In a declaration submitted by appellants' counsel in opposition to the motion to strike costs, counsel for the County detailed hours spent by him and his office paralegals communicating with County staff and board members to collect the documents they needed to include in the record, transcribing records of hearings and verifying their accuracy, and communicating with appellants regarding the form of the record's index and contents of the record. Counsel attached to his declaration numerous e-mails

29

between himself and McMillan, demonstrating efforts to resolve disagreements McMillan raised regarding the form and content of the record.  In light of the evidence submitted, the superior court acted within its discretion in finding the costs incurred to prepare the record in the form of attorney rates were both reasonably necessary and for a reasonable amount.

## DISPOSITION

We affirm the superior court's judgment and ruling on appellants' motion to strike costs.


_____

HULL, Acting P. J.


We concur:


_____

MURRAY, J.


_____

RENNER, J.